******************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# JOSE AYUSO *v.* COMMISSIONER OF CORRECTION
## (AC 43985)

Moll, Alexander and Suarez, Js.

*Syllabus*

Convicted of several crimes after a shooting incident in which he wounded two police officers, J and O, the petitioner sought a writ of habeas corpus. He claimed, inter alia, that his trial, appellate and habeas counsel provided ineffective assistance and that the prosecutor at his criminal trial knowingly presented false testimony. The petitioner had approached an unmarked police vehicle in a parking lot and fired gunshots at three undercover officers in the vehicle. As J got out of the driver's side of the vehicle, one of two gunshots the petitioner fired toward him struck the bulletproof vest J was wearing under his clothes. The petitioner claimed, inter alia, that the prosecutor knowingly presented and failed to correct false testimony from the third officer, P, that one of the bullets the petitioner fired had lodged in or damaged J's bulletproof vest and that P had witnessed damage to the vest shortly after the shooting. The habeas court rejected the petitioner's claim, concluding that P had not intended to deceive the jury. In a subsequent articulation, the court affirmed its decision, relying on the fact that the petitioner's counsel had had an opportunity to examine the vest prior to trial. The court denied the habeas petition and thereafter denied the petition for certification to appeal to this court. *Held*:

1. The habeas court did not abuse its discretion in denying the petitioner certification to appeal from the judgment denying his petition for a writ of habeas corpus; the petitioner failed to demonstrate that his claims involved issues that were debatable among jurists of reason, that a court could resolve those issues in a different manner or that the questions they raised were adequate to deserve encouragement to proceed further.

2. The petitioner's claim that he was deprived of his right to due process when the prosecutor failed to correct P's testimony concerning the bulletproof vest was unavailing, as P's testimony was neither false nor substantially misleading: P's reference to the impact on J's bulletproof vest of one of the bullets the petitioner fired was incidental to P's description of the injuries he observed when he examined J in the immediate aftermath of the shooting, and P's description of those injuries did not convey to the jury that he had inspected or witnessed damage to the vest; moreover, even if P's testimony was false or substantially misleading, the petitioner was unable to demonstrate that the prosecutor's failure to correct the testimony was fundamentally unfair, as there was no reasonable likelihood that the testimony could have affected the judgment of the jury, the condition of J's vest was not relevant to any of the crimes of which the petitioner was convicted or to any material issue in the case, there was no evidence that something other than a bullet could have caused J's injury, and, in the context of the petitioner's defense of self-defense, it was inconsequential for the jury to determine what the petitioner struck when he used deadly physical force by discharging his handgun; furthermore, the petitioner's assertion that P's testimony about the vest was relevant to assessing J's credibility was unavailing, as the existence of damage to the vest would not have tended to undermine J's trial testimony, the jury reasonably could have found that one of the bullets that the petitioner fired caused J's injury, regardless of the existence of damage to the vest, and, although the court, in its initial decision and in its articulation, incorrectly failed to focus its analysis on the substance of the relevant evidence to determine if it was false or substantially misleading, this court concluded that the same result was required by law.

3. The petitioner's claim that he was deprived of the effective assistance of counsel at his criminal trial was unavailing:

   a. Trial counsel's decision not to challenge the state's evidence that a bullet caused J's injury did not prejudice the petitioner, as counsel believed that the pursuit of such a strategy would detract from the petitioner's self-defense claim, that it would not have been beneficial

with respect to the attempted murder or assault charges against the petitioner concerning J and that the presence of physical damage to the vest was not significant; moreover, the habeas court's focus on whether the petitioner was prejudiced by counsel's performance was proper in light of testimony from the physician who treated J that a gunshot was the only way to explain J's injuries, and, as it was undisputed that the petitioner used a firearm during the shooting, whether J was struck by a bullet or whether the petitioner had assaulted O or attempted to assault P was unrelated to the petitioner's claim of self-defense; furthermore, even if the jury had found that the petitioner did not cause J's injury, the state would have been entitled to an instruction on the lesser included offense of attempt to commit assault, which carried the same penalty as a conviction of assault.

b. There was no reasonable probability that the outcome of the petitioner's criminal trial would have been different, as he contended, if his counsel had investigated and presented certain evidence in support of his self-defense claim: although the petitioner claimed that testimony from a mental health professional would have been critical to the jury's understanding of his behavior, the petitioner's reliance on the opinions of a psychologist who testified at the habeas trial about his state of mind at the time of the shooting incident was undermined by the fact that the psychologist's evaluations of him occurred more than fifteen years after the shooting incident, and the petitioner's assertion that certain other testimony about a lethal threat that purportedly had been made to him on the day of the shooting would have corroborated his claimed belief that the police had come to carry out the threat would not have shed light on whether he subjectively believed at the time of the shooting that the threat was credible or that he actually feared for his life; moreover, the petitioner's attempt to demonstrate that he was prejudiced by his counsel's failure to present that evidence was hampered by the fact that, even if the petitioner had been able to demonstrate that he subjectively feared for his life at the time of the shooting, the evidence at trial did not support a conclusion that his use of deadly physical force was objectively reasonable; furthermore, even though the habeas court incorrectly determined that trial counsel's failure to investigate and present the testimony of those witnesses in support of the petitioner's self-defense claim was not prejudicial because such evidence was to some extent cumulative of the petitioner's trial testimony, the court nevertheless reached the correct result, as such evidence was unlikely to have swayed the jury to find that the petitioner's use of force was objectively reasonable.

c. The petitioner's defense at trial was not prejudiced as a result of his counsel's failure to object pursuant to *State* v. *Morales* (232 Conn. 707) to the state's failure to preserve and make available to counsel the vehicle that the officers occupied at the time of the shooting incident: the petitioner failed to satisfy the requirement under *Morales* that the vehicle was material to his defense and that the result of his trial would have been different had it been available to him, as the evidence supported the habeas court's determination that the petitioner failed to show what benefit further testing beyond that presented to the jury could have provided or that anything material was lost by virtue of the manner in which the police stored the vehicle; moreover, it was undisputed that the petitioner's trial counsel had observed the vehicle in a junkyard prior to trial and did not pursue testing of it at that time or make any further request of the court with respect to the vehicle, and, although the petitioner's forensic criminologist testified at the habeas trial that certain forensic testing could have been performed had the vehicle been stored in a different manner, the criminologist lacked any reliable data from which to draw conclusions and essentially speculated about what such testing might have entailed; furthermore, defense counsel's arguments at trial and cross-examination of the state's witnesses reflected counsel's belief that the forensic analysis of the crime scene and the vehicle that had been performed by the state provided the defense with ample fodder to undermine the state's theory of the shooting.

4. The petitioner could not prevail on his claim that he was deprived of the effective assistance of his appellate counsel:

a. Despite his contention that his appellate counsel should have challenged the trial court's failure to instruct the jury regarding a witness who purportedly had threatened him on the day of the shooting and should have raised claims concerning the court's refusal to allow him

to call the witness so that any invocation of the witness' fifth amendment privilege would occur on a question-by-question basis before the jury, the petitioner did not demonstrate that counsel's representation was deficient, as he failed to present any authority to support his assertions that the trial court had acted improperly, his claim amounted to little more than speculation that a reviewing court would have found error, and he merely asserted in conclusory fashion that raising those claims would have resulted in a reasonable probability that he would have prevailed in his direct appeal from his conviction.

b. The petitioner's claim that his appellate counsel rendered deficient performance by failing to raise a *Morales* claim concerning the state's failure to preserve the police officers' vehicle was unavailing; contrary to the petitioner's contention, even if counsel had performed deficiently by not raising a *Morales* claim in the petitioner's direct appeal from his conviction, her performance did not prejudice the petitioner, as more than a reasonable probability existed that a reviewing court would have rejected a *Morales* claim under the first condition of *State* v. *Golding* (213 Conn. 233), the record having been devoid of an adequate factual record as to whether a *Morales* violation occurred.

c. The petitioner failed to demonstrate that his appellate counsel performed deficiently by failing to raise an unpreserved claim that the prosecutor improperly vouched for J's credibility during closing argument to the jury: the prosecutor did not improperly express a personal belief in J's credibility but, rather, invited the jury to infer that any inconsistencies in J's recollection of the shooting were the result of the emotional state he was in at that time; moreover, the petitioner's trial counsel did not object to the prosecutor's argument, and the petitioner failed to cite any authority to support a conclusion that his appellate counsel rendered deficient performance by failing to raise the claim or that a reasonable probability existed that, had the claim been raised, it would have changed the outcome of the petitioner's direct appeal.

5. The petitioner could not prevail on his claim that the habeas court improperly precluded the petitioner's counsel from questioning the trial prosecutor about whether he should have known at the time of trial that certain of P's testimony about J's bulletproof vest was false: counsel's inquiry into what additional investigation the prosecutor could have undertaken regarding whether the vest had been struck by a bullet that the petitioner fired was not relevant to the allegation in the habeas petition that the prosecutor knew at the time of trial that P had provided false testimony; because the petitioner alleged in the habeas petition only that the prosecutor had knowingly presented false testimony but did not allege alternatively that the prosecutor should have known that P's testimony was false, what the prosecutor should have known about the vest and, thus, the veracity of P's testimony, was not material to the issue framed in the habeas petition.

Argued November 9, 2021—officially released September 20, 2022

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland, where the petition was withdrawn in part; thereafter, the case was tried to the court, *Newson, J.*; judgment denying the petition; subsequently, the court denied the petition for certification to appeal, and the petitioner appealed to this court. *Appeal dismissed.*

*Michael W. Brown*, assigned counsel, for the appellant (petitioner).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, and *Tamara A. Grosso*, former assistant state's attorney, for the appellee (respondent).

*Opinion*

SUAREZ, J. The petitioner, Jose Ayuso, appeals following the denial of his petition for certification to appeal from the judgment of the habeas court denying his petition for a writ of habeas corpus. The petitioner claims that the court abused its discretion in denying his petition for certification to appeal because (1) the prosecutor's presentation of false or misleading testimony at his criminal trial violated his due process right to a fair trial, (2) his trial counsel's performance was deficient and deprived him of his right to the effective assistance of trial counsel, (3) his appellate counsel's performance was deficient and deprived him of his right to the effective assistance of appellate counsel, and (4) the habeas court committed an evidentiary error that entitles him to a new habeas trial. We dismiss the appeal.

The following facts and procedural history are relevant to the claims raised on appeal. Following a jury trial in 2004, the petitioner was convicted of two counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (5), one count of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59 (a) (5), one count of carrying a pistol without a permit in violation of General Statutes § 29-35, and one count of criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1).[1] This court previously has summarized the facts the jury reasonably could have found: "On June 5, 2003, at approximately 1 a.m., Officers Tishay Johnson and Victor Otero and Sergeant Gerry Pleasant of the Hartford [P]olice [D]epartment were working undercover to target street crimes in Hartford and were patrolling the city in an unmarked, two door Toyota Tercel. At that time, the undercover officers received a radio dispatch, directing them to investigate the 500 block of Zion Street for loitering and narcotics sales. Johnson then drove northbound on Zion Street, turning right onto Park Street. Johnson entered a driveway located between 835 and 853 Park Street and parked the vehicle in the rear parking lot. After Johnson parked the vehicle, the [petitioner], who had been standing underneath a nearby tree, approached the driver's side of the vehicle. Pleasant immediately recognized the [petitioner] from previous encounters. Johnson rolled down the window, and the [petitioner] asked Johnson what he needed. In response, Johnson asked the [petitioner] what he had.

"The [petitioner] then looked inside the vehicle at Otero, who was sitting in the backseat, and at Pleasant, who was sitting in the front passenger seat, and then stepped away from the vehicle. Pleasant and Johnson, who still were seated in the front seat, heard the [petitioner] load his gun, which was a .40 caliber Glock semiautomatic handgun. Johnson also observed the [petitioner] point the gun at him. As Johnson was exiting

the vehicle, the [petitioner] fired two gunshots in Johnson's direction, one of which struck the bulletproof vest that Johnson was wearing underneath his clothes. The [petitioner] continued to shoot as he moved away from the vehicle, and the officers also fired their .45 caliber semiautomatic handguns. During this time, the [petitioner] shot Otero several times. Johnson briefly chased the [petitioner] down Park Street; however, Johnson returned to the parking lot after exhausting his supply of ammunition. Pleasant then notified the police dispatcher of the situation, providing a description of the [petitioner], and requested an ambulance. Johnson, who was experiencing pain in his ribs, and Otero, who was bleeding from his abdomen, lay on the ground and waited to be taken to a hospital.

"Although the [petitioner] had sought refuge in a nearby apartment building on Mortson Street, responding officers, having been informed of the [petitioner's] whereabouts by a resident of the apartment building, eventually located and arrested him. The police also located the [petitioner's] .40 caliber Glock handgun in an apartment on Mortson Street. The [petitioner] later was brought to the hospital so that the officers could identify him. Johnson made a positive identification of the [petitioner]." *State* v. *Ayuso*, 105 Conn. App. 305, 307–308, 937 A.2d 1211, cert. denied, 286 Conn. 911, 944 A.2d 983 (2008). During his criminal trial, the petitioner was represented by Attorneys Jeffrey Kestenband and William Paetzold. In 2005, the trial court, *Mullarkey, J.*, imposed a total effective sentence of forty-one years of imprisonment, with a two year mandatory minimum to serve.

Following his conviction, the petitioner brought a direct appeal to this court, which affirmed the judgment of conviction. See id., 305. Later, our Supreme Court denied the petitioner's petition for certification to appeal. See *State* v. *Ayuso*, 286 Conn. 911, 944 A.2d 983 (2008). The petitioner's appellate counsel was Stephanie L. Evans.

The petitioner had brought a prior action for a writ of habeas corpus, which was dismissed for failure to prosecute. This court dismissed the petitioner's subsequent appeal from the judgment rendered by the habeas court in the prior habeas action. See *Ayuso* v. *Commissioner of Correction*, 146 Conn. App. 906, 77 A.3d 216, cert. denied, 310 Conn. 961, 82 A.3d 628 (2013).

On July 8, 2014, the petitioner commenced the underlying action for a writ of habeas corpus. By way of his amended petition dated November 14, 2018, the petitioner, represented by counsel, alleged in count one that the prosecutor at his criminal trial violated his due process right to a fair trial by knowingly presenting and failing to correct false testimony that affected the outcome of the trial. Specifically, the petitioner alleged that Pleasant "falsely testified that Johnson was shot

by the petitioner on June 5, 2003, with a bullet that was lodged in or otherwise damaged Johnson's bulletproof vest and that Pleasant witnessed damage to the vest shortly after the shooting." In count two, the petitioner alleged that the prosecutor violated his due process right to a fair trial by failing to disclose favorable evidence to the defense, namely, "that [Johnson's] gun holster, which he was wearing on his right side at the time of the shooting, was damaged by a bullet." The petitioner alleged that, if this evidence had been disclosed to the defense in time for it to have been relied on at the time of trial, "the result of the petitioner's criminal trial would have been different and more favorable to the petitioner." In count three, the petitioner alleged that he did not receive the effective assistance of counsel in connection with his criminal trial and that, but for counsel's deficient performance, the outcome of the trial would have been different and more favorable to him. In count four, the petitioner alleged that he did not receive the effective assistance of counsel in connection with his direct appeal and that, but for appellate counsel's deficient performance, the outcome of the appeal would have been different and more favorable to him. In count five, the petitioner alleged that he was deprived of the effective assistance of counsel in connection with his prior habeas action and that, but for habeas counsel's deficient performance, the outcome of the action would have been different and more favorable to him.

The respondent, the Commissioner of Correction, filed a return in which he denied the substantive allegations in each count of the petition. With respect to the first and second counts of the petition, the respondent alleged the special defense of procedural default. With respect to counts three and four, the respondent alleged that the allegations therein "fail to state claims upon which relief can be granted, present the same grounds as a previously denied/dismissed petition and fail to state facts or to proffer new evidence not available at the time of the prior petition, are successive in nature, and must be dismissed pursuant to Practice Book §§ 23-29 [and] 23-30." The petitioner filed a reply in which he denied each and every special defense on which the respondent relied.

On April 24 and 29, and June 11, 2019, the court, *Newson, J.*, conducted an evidentiary hearing on the petition for a writ of habeas corpus. Prior to trial, the petitioner withdrew the fifth count of his petition, in which he alleged a deprivation of his right to the effective assistance of habeas counsel in his prior habeas action.

In a thorough memorandum of decision dated January 10, 2020, the habeas court addressed the merits of the claims raised and denied the petition for a writ of habeas corpus. We will discuss the details of the court's

decision as necessary in the context of the claims raised on appeal.[2] The habeas court subsequently denied the petitioner's petition for certification to appeal to this court. This appeal followed.

I

We first address the petitioner's claim that the habeas court erred in denying his petition for certification to appeal.[3] We conclude that the court's ruling did not constitute an abuse of its discretion.

General Statutes § 52-470 (g) provides: "No appeal from the judgment rendered in a habeas corpus proceeding brought by or on behalf of a person who has been convicted of a crime in order to obtain such person's release may be taken unless the appellant, within ten days after the case is decided, petitions the judge before whom the case was tried or, if such judge is unavailable, a judge of the Superior Court designated by the Chief Court Administrator, to certify that a question is involved in the decision which ought to be reviewed by the court having jurisdiction and the judge so certifies."

"'Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion. . . . A petitioner may establish an abuse of discretion by demonstrating that the issues are debatable among jurists of reason . . . [the] court could resolve the issues [in a different manner] . . . or . . . the questions are adequate to deserve encouragement to proceed further. . . . The required determination may be made on the basis of the record before the habeas court and applicable legal principles. . . . If the petitioner succeeds in surmounting that hurdle, the petitioner must then demonstrate that the judgment of the habeas court should be reversed on its merits.' . . . *Crespo* v. *Commissioner of Correction*, 292 Conn. 804, 811, 975 A.2d 42 (2009); see also *Simms* v. *Warden*, 230 Conn. 608, 615–16, 646 A.2d 126 (1994) (adopting factors identified by United States Supreme Court in *Lozada* v. *Deeds*, 498 U.S. 430, 431–32, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991), as appropriate standard for determining whether habeas court abused its discretion in denying certification to appeal).

" 'In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by [our Supreme Court] for determining the propriety of the habeas court's denial of the petition for certification.' . . . *Vil-*

*lafane* v. *Commissioner of Correction*, 190 Conn. App. 566, 573, 211 A.3d 72, cert. denied, 333 Conn. 902, 215 A.3d 160 (2019)." *Antonio A.* v. *Commissioner of Correction*, 205 Conn. App. 46, 78–79, 256 A.3d 684, cert. denied, 339 Conn. 909, 261 A.3d 744 (2021).

For the reasons set forth in the remainder of this opinion, we conclude, on the basis of our review of the record and applicable legal principles, that the petitioner has not demonstrated that the claims of error related to the court's denial of his petition for a writ of habeas corpus are issues that are debatable among jurists of reason, that a court could resolve the issues in a different manner, or that the questions are adequate to deserve encouragement to proceed further. Accordingly, we conclude that the court did not abuse its discretion in denying the petition for certification to appeal and, therefore, dismiss the appeal.

II

The petitioner claims that the prosecutor's presentation of false or misleading testimony at his criminal trial violated his due process right to a fair trial. We are not persuaded.

This claim arises from the habeas court's rejection of the claim set forth in count one of the petition for a writ of habeas corpus, in which the petitioner alleged that "Pleasant falsely testified [at the criminal trial] that Johnson was shot by the petitioner on June 5, 2003, with a bullet that was lodged in or otherwise damaged Johnson's bulletproof vest and that Pleasant witnessed damage to the vest shortly after the shooting." The petitioner alleged that the prosecutor knew that this testimony was false and failed to correct the testimony. The petitioner alleged that "[t]here is a reasonable likelihood that—but for the false testimony of Pleasant about Johnson being shot by the petitioner in the area of the bulletproof vest—the result of the petitioner's criminal trial would have been different and more favorable to the petitioner."

Transcripts of the criminal trial proceedings were in evidence at the habeas trial. These reveal that, prior to the criminal trial, defense counsel filed a motion to test Johnson's bulletproof vest "to determine the bullet that struck [Johnson] [and] which firearm that came from, if possible." The prosecutor represented to the court that the state was in possession of the bulletproof vest worn by Johnson at the time of the shooting. The prosecutor also represented that, after Johnson had inspected his vest, Johnson did not believe that the vest had been penetrated by a bullet. The prosecutor stated that, although Johnson's vest had "a mark" on it, "I don't have any evidence to show that there was any bullet associated with [Johnson's] vest." Later that day, after defense counsel had an opportunity to inspect Johnson's vest, defense counsel informed the court that

"the vest that [Johnson] was wearing did not appear to contain any type of marking or bullet hole." Thereafter, defense counsel stated, "[w]e are all set on that."

During the criminal trial, Johnson testified that, at the time of the shooting, he was wearing a bulletproof vest underneath his street clothing, specifically, a football jersey. He testified that the first gunshot fired by the petitioner shattered the window of the unmarked police vehicle in which he and his fellow officers were seated. He also testified that the first or second gunshot fired by the petitioner struck him. Johnson testified that, after the shooting, he experienced pain. He testified, "I laid down on the ground because I didn't know what type of injuries I sustained in being shot." After being examined at Hartford Hospital, he learned that he had sustained a bruised liver and a cracked rib. Ronald Gross, Johnson's treating physician at Hartford Hospital, testified at the criminal trial that Johnson had "what appeared to be a superficial abrasion wound" across his right hip and abrasions on his right arm that were consistent with "what [he] thought [was] a bullet wound."

Pleasant testified at the criminal trial about what he observed during the shooting. Pleasant testified that he was in the front passenger seat of the unmarked police automobile, Otero was in the backseat, and Johnson was in the driver's seat. Pleasant testified that the petitioner and Johnson began speaking with one another, and the petitioner, who was standing near Johnson, made a comment that suggested he knew that Pleasant, Otero, and Johnson were police officers. Pleasant testified that "a rapid succession of gunshots" by the petitioner followed. Pleasant exited the automobile and began firing his police firearm in the direction of the petitioner, who was fleeing on foot. Pleasant testified that he attempted to assist Johnson, who had pursued the petitioner briefly but then "staggered back" to Pleasant and indicated that he was "hit." Pleasant testified, "I lay him down and I tore his clothes off, and I was able to observe a small wound, a burn, really, *where the bullet had impacted the bulletproof vest* and burned his skin from the twisting action of the bullet. And then I inspected [Otero], and it was clear to me that he was more grievously wounded because he had some blood coming out of his side." (Emphasis added.)

At the criminal trial, the petitioner admitted discharging his .40 caliber Glock semiautomatic handgun in the direction of the unmarked police automobile. He testified that he "was just firing" at the automobile because the driver appeared to be reaching for a firearm, and he was "scared for [his] life."

At the habeas trial, a forensic scientist and forensic criminologist, Brent E. Turvey, testified that his examination of the bulletproof vest that Johnson was wearing at the time of the shooting did not reveal any damage

to the vest. Turvey also testified that, if a bulletproof vest was struck by a bullet fired from a large caliber weapon, he "would expect that there would be damage to the vest. And if it was in an area where there was one of the metal plates, I would expect . . . some indication on that plate that it had been struck. But at least . . . any . . . strike of a bullet to the vest in any location I would expect to be damage to the exterior of that vest at that location." Turvey acknowledged, however, that it was possible that a bullet had struck Johnson but did not strike his bulletproof vest. At the habeas trial, Gross opined that Johnson's injury was consistent with a bullet hitting his bulletproof vest directly.

At the habeas trial, Pleasant testified that, when he examined Johnson following the shooting, his primary concern was to ascertain the nature of Johnson's injuries, not the condition of his bulletproof vest. He recalled neither examining the vest nor whether he noticed any damage to the vest. Pleasant testified that "Johnson made some statement to the effect that he had been struck. I also noticed [Otero] was attempting to join us, and I then examined both of them for any potential injuries. I examined [Johnson] first. In the course of my examination, I observed what I believed at the time was something consistent with an abrasion wound caused by what I assumed was the twerking of vest fibers from a bullet. I'm not a ballistics expert, but that was my impression, which was consistent with the events that occurred." Pleasant went on to explain that "a bullet twists due to the rifling in a barrel, and I thought that the mark on the skin would have been caused by . . . that twerk. Now, whether or not that actually happens, I don't know. . . . I am communicating to you what my thoughts were at that time."

The prosecutor at the petitioner's criminal trial, James Thomas, testified at the habeas trial that the testimony at issue from Pleasant was not false testimony because, "when [Pleasant] lifted the clothing, there was a bulletproof vest up on top of the clothing, and I think he just assumed that whatever wound was underneath had impacted the outer clothing, which would have been the bulletproof vest." According to Thomas, the testimony appeared to have been based on inferences drawn by Pleasant on the basis of the injuries he witnessed when he inspected Johnson, as well as the clothing that Johnson was wearing at the time of the shooting. Thomas testified that he would have corrected Pleasant's testimony if he believed that it was false testimony, and he testified that he believed the evidence demonstrated that "Johnson was struck with a bullet over his bulletproof vest." Thomas also testified that he believed it was possible that a bullet could strike a bulletproof vest without causing damage to the vest.

In rejecting the petitioner's due process claim, the

habeas court stated: "There is no need to engage in substantive discussion of this claim because the assertion that the state knowing[ly] submitted false testimony or that [Pleasant] knowingly testified falsely is wholly without merit.

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. . . . This standard . . . applies whether the state solicited the false testimony or allowed it to go uncorrected . . . . False testimony means testimony that is more than simply wrong or which can be challenged factually by some other evidence or testimony. . . . In law, [false] means something more than untrue; it means something designedly untrue and deceitful and implies an intention to perpetrate some treachery or fraud. The totality of [Pleasant's] testimony on this issue was as follows: '[The petitioner] ran north through an alley, at which point [Johnson] broke off his pursuit and staggered back and said to me, boss, I'm hit. And I lay him down and tore his clothes off, and I was able to observe a small wound, a burn, really, where the bullet had impacted the bulletproof vest and burned his skin from the twisting action of the bullet.' . . .

"Pleasant also testified before this court and was found to be a credible witness who simply testified to his honest belief about what he saw in the midst of a chaotic and traumatic event. There is no dispute that [Johnson] suffered a significant localized injury during this incident.[4] What the petitioner disputes is whether the bulletproof vest shows visible evidence of damage from the bullet strike. While his testimony may be subject to challenge, or even contradicted by other evidence, the petitioner has failed to provide the slightest shred of evidence that there was any design or intent by [Pleasant] to testify to something he knew to be untrue. . . . The petitioner has attempted to turn a standard conflict between eyewitness recollection and physical evidence into an intentional falsehood. His claim is dubious and fails for a lack of credible evidence." (Citations omitted; footnote in original.)

In a motion for articulation, the petitioner made the following request of the trial court: "On what basis did the court decline to apply the legal standard and reasoning set forth . . . [in] *Henning* v. *Commissioner of Correction*, 334 Conn. 1, [219 A.3d 334] (2019), including but not limited to the commentary found on page 4 at footnote 3 that, 'under *Brady* [v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] and its progeny, it makes no difference whether [the testimony of a state's witness] . . . was intentionally false or merely mistaken'?"[5]

The habeas court granted the motion for articulation with respect to this request. The court stated: "*Brady*

. . . is [the] beginning of the line of cases standing for the state's obligation to disclose exculpatory evidence, and the line of cases that [hold that] . . . materially inaccurate testimony will be imputed to the state's attorney. In the present case, however, *Brady* was not violated as a matter of law. Defense counsel had the opportunity to examine the vest in question during a pretrial conference . . . and, at least in the opinion by [Paetzold], did not believe the vest in question to have any visible damage. '*Brady* cannot be violated if the [defendant] had actual knowledge of the relevant information or if the documents are part of public records and defense counsel should know of them and fails to obtain them because of lack of diligence in his own investigation.' *United States* v. *Zamari*, 111 F.3d 307, 320 (2d Cir.), cert. denied sub nom. *Herzog* v. *United States*, 522 U.S. 983, 118 S. Ct. 445, 139 L. Ed. 2d 381 (1997), and cert. denied sub nom. *Shay* v. *United States*, 522 U.S. 988, 118 S. Ct. 455, 139 L. Ed. 2d 390 (1997). Therefore, although the court's reasoning under the memorandum of decision was different, the result is the same." (Footnote omitted.)

The petitioner claims that the court's analysis of his claim was legally flawed. The petitioner argues that, "[a]t the habeas trial, [he] proved that the prosecuting authority had presented testimony that it knew or should have known was false or misleading about the vest that [Johnson] was wearing at the time of the shooting. In rejecting the claim, the habeas court mischaracterized the nature of the claim, calling it a dispute about 'whether the bulletproof vest shows visible evidence of damage from the bullet strike.' . . . In fact, the claim was that the vest was not damaged, that the vest would be damaged if it had been struck by a bullet, that the prosecutor knew or should have known it was not damaged, and that his failure to correct the testimony suggesting that it was damaged misled the jury on a key issue that drove to an essential element of one of the serious charges the petitioner was facing at trial. Put simply, the available evidence displays Johnson's vest was not damaged because Johnson was not shot. Pleasant's testimony about observing damage to the vest was false or misleading. There is a reasonable likelihood that this altered the jury's verdict because, if the jury had not been misled, there is a reasonable likelihood that they would conclude that Johnson was not shot, and they would at least acquit the petitioner on one count of assault in the first degree. There is also a reasonable likelihood [that] it would have altered their entire verdict at the criminal trial. Further, the habeas court erred by focusing on the mental state of the witnesses who suggested to the jury that the vest was damaged, overlooking the well established case law holding that a witness' subjective understanding of the truthfulness of their testimony is not the dispositive question in a false testimony claim. The habeas court

also erred in assessing the harm from the violation . . . because it relied [on] the subjective beliefs of a witness in delivering testimony that would seemingly be physically impossible." (Emphasis omitted; footnote omitted.)

Having discussed the petitioner's claim, we set forth relevant legal principles. As a general proposition, "[d]ue process is . . . offended if the state, although not soliciting false evidence, allows it to go uncorrected when it appears." (Internal quotation marks omitted.) *State* v. *Ouellette*, 295 Conn. 173, 186, 989 A.2d 1048 (2010). This constitutional safeguard prohibits not only the solicitation of *false* evidence, which is objectively untruthful, but the solicitation of evidence that *substantially mischaracterizes* facts and, thus, has a tendency to mislead the finder of fact. In the context of a due process claim arising from the testimony of two state's witnesses concerning the existence of inducements in exchange for their testimony, our Supreme Court explained: "If a government witness falsely denies having struck a bargain with the state, or substantially mischaracterizes the nature of the inducement, the state is obliged to correct the misconception. . . . Regardless of the lack of intent to lie on the part of the witness, [controlling precedent] require[s] the prosecutor to apprise the court when he or she knows that the witness is giving testimony that is substantially misleading." (Internal quotation marks omitted.) *Gomez* v. *Commissioner of Correction*, 336 Conn. 168, 175, 243 A.3d 1163 (2020).

"The rules governing our evaluation of a prosecutor's failure to correct false or misleading testimony are derived from those first set forth by the United States Supreme Court in *Brady* v. *Maryland*, [supra, 373 U.S. 86–87] . . . [in which] the court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process [when] the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the [prosecutor]. . . . The United States Supreme Court also has recognized that [t]he jury's estimate of the truthfulness and reliability of a . . . witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. . . . Accordingly, the *Brady* rule applies not just to exculpatory evidence, but also to impeachment evidence . . . which, broadly defined, is evidence having the potential to alter the jury's assessment of the credibility of a significant prosecution witness. . . .

"Not every failure by the state to disclose favorable evidence rises to the level of a *Brady* violation. Indeed, a prosecutor's failure to disclose favorable evidence will constitute a violation of *Brady* only if the evidence is found to be material. . . . In a classic *Brady* case,

involving the state's inadvertent failure to disclose favorable evidence, the evidence will be deemed material only if there would be a reasonable probability of a different result if the evidence had been disclosed. . . . A reasonable probability of a different result is . . . shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. . . .

"When, however, a prosecutor obtains a conviction with evidence that he or she knows or should know to be false, the materiality standard is significantly more favorable to the defendant. [A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair . . . and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. . . . This standard . . . applies whether the state solicited the false testimony or allowed it to go uncorrected . . . and is not substantively different from the test that permits the state to avoid having a conviction set aside, notwithstanding a violation of constitutional magnitude, upon a showing that the violation was harmless beyond a reasonable doubt. . . .

"Furthermore, it is well established that this stringent materiality test applies when a prosecutor elicits testimony that he or she knows or should know to be false, [r]*egardless of the lack of intent to lie on the part of the witness* . . . . This strict standard of materiality is appropriate in such cases not just because they involve prosecutorial [impropriety], but more importantly because they involve a corruption of the [truth seeking] function of the trial process. . . . In light of this corrupting effect, and because the state's use of false testimony is fundamentally unfair, prejudice sufficient to satisfy the materiality standard is readily shown . . . such that reversal is virtually automatic . . . unless the state's case is so overwhelming that there is no reasonable likelihood that the false testimony could have affected the judgment of the jury. . . . In accordance with these principles, our determination of whether . . . false testimony was material under *Brady* and its progeny requires a careful review of that testimony and its probable effect on the jury, weighed against the strength of the state's case and the extent to which the petitioner . . . [was] otherwise able to impeach [the witness]. . . . Finally, because our role in examining the state's case against the petitioner is to evaluate the strength of that evidence and not its sufficiency, we do not consider the evidence in the light most favorable to the state. . . . Rather, we are required to undertake an objective review of the nature and strength of the state's case." (Citations omitted; emphasis altered; internal quotation marks omitted.) *Henning* v. *Commissioner of Correction*, supra, 334 Conn. 23–26.

"The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Accordingly, [t]he habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review." (Citations omitted; internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 677, 51 A.3d 948 (2012). In the present case, the material facts found by the habeas court are not in dispute, and the issue may be distilled to whether the prosecutor's failure to correct Pleasant's testimony concerning Johnson's bulletproof vest deprived the petitioner of his right to due process.

In its initial decision, the habeas court rejected the petitioner's due process claim after concluding that Pleasant did not intend to deceive the jury. In contrast, in its articulation, the habeas court relied on the fact that defense counsel had the opportunity to examine the vest prior to the start of the trial. We agree with the petitioner and the respondent that the court's analysis was legally flawed in both respects. As we have stated previously, the proper focus of the habeas court's analysis should have been on the substance of the relevant evidence to determine if it was *false* or *substantially misleading*. Notwithstanding the error in the court's analysis, we may affirm the result reached by the court if, in our plenary review of the issue of whether the petitioner's due process rights were violated, we conclude that the same result is required by law. "An appellate court may affirm the judgment of the [habeas] court although it may have been grounded on a wrong reason . . . ." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 208 Conn. App. 204, 214 n.9, 264 A.3d 121, cert. denied, 340 Conn. 911, 264 A.3d 1001 (2021).

Following our plenary review of the relevant facts and Pleasant's testimony, which are not in dispute, we conclude that the testimony was neither false nor substantially misleading. Pleasant testified at the petitioner's criminal trial that he "was able to observe a small wound, a burn, really, where the bullet had impacted the bulletproof vest and burned [Johnson's] skin from the twisting action of the bullet." This testimony conveys only that Pleasant observed Johnson wearing a bulletproof vest and that he observed a small wound or a burn on Johnson's torso. Pleasant did not state that he inspected the vest or that he observed damage to the vest. Pleasant's reference to the injury being located "where the bullet had impacted the bulletproof vest and burned [Johnson's] skin from the twisting action of the bullet" does not convey, as the petitioner

suggests, that Pleasant witnessed damage to the vest. To the extent that Pleasant referred to a bullet impacting the vest, that appears to be his attempt at suggesting how the physical injury that he observed may have been caused, which was not something that the prosecutor invited Pleasant to do. Thus, we interpret Pleasant's reference to the vest as incidental to his description of the injuries he observed when he examined Johnson in the immediate aftermath of the shooting. Moreover, as we previously have discussed, the evidence fully supported Pleasant's reference to the fact that a shooting occurred, as the parties agree that the evidence reflected that Johnson was wearing a bulletproof vest at the time that the petitioner discharged his .40 caliber Glock semiautomatic handgun into the automobile in which Johnson was an occupant.

Even if we were to conclude that Pleasant's testimony was false or substantially misleading, however, the petitioner is unable to demonstrate that the prosecutor's failure to correct it was fundamentally unfair because there is no reasonable likelihood that the false testimony could have affected the judgment of the jury. The petitioner has not demonstrated that the condition of Johnson's vest was relevant to any material issue in the case, including the defense of self-defense. There also was no evidence that something other than one of the bullets discharged by the petitioner could have caused Johnson's injury. In evaluating whether the state disproved the defense of self-defense, the jury was asked to focus on the circumstances in which the petitioner used deadly physical force and whether the petitioner reasonably believed that his undisputed use of deadly physical force was necessary to repel the alleged attack.[6] In the context of the defense of self-defense, it was inconsequential for the jury to determine what the petitioner struck when he used deadly physical force by discharging his handgun. As we stated previously, the petitioner testified that he fired on the officers and explained the reasons for his actions. He testified that he "was just firing" his handgun and that the bullets "landed where they landed. That's what it was, but I was firing, man. I was trying to get out of there. That's all I was trying to do  . . . ."

The condition of Johnson's vest also was not relevant to any of the offenses of which the petitioner was convicted. Following the petitioner's trial testimony, the evidence was not in dispute that the petitioner committed the offenses of carrying a pistol without a permit and criminal possession of a firearm. The petitioner is unable to demonstrate that the condition of the vest was relevant to the charge of assault in the first degree with respect to Otero, the charge of assault in the first degree with respect to Johnson, or the charge of attempt to commit assault in the first degree with respect to Pleasant. The state presented overwhelming and undisputed evidence that the petitioner emptied his firearm

in the direction of the unmarked police automobile in which Otero, Johnson, and Pleasant were occupants. The petitioner admitted to using deadly physical force because he believed that one or more occupants of the automobile was about to harm him. His use of the firearm in this manner, and not the possibility that Johnson's vest may have sustained damage caused by a bullet, was overwhelming evidence of his intent to cause serious physical injury.

The petitioner argues that, "[i]f the state acknowledged that the vest was not damaged, and that Pleasant was mistaken in his testimony, the jury would logically be left to wonder how Johnson's injury was caused. . . . If the jury was presented with [evidence of] minor injuries [to Johnson] and the information that the vest was not struck by a bullet, there would be a reasonable doubt whether Johnson was shot." The petitioner also asserts that Pleasant's testimony about Johnson's bulletproof vest was relevant to an assessment of Johnson's credibility because the officers' version of events was hotly contested and "whether Johnson was shot was put into question at the habeas trial . . . ." These arguments are flawed because they overlook the fact that, regardless of the existence of damage to Johnson's vest, the jury reasonably could have found that one of the bullets fired by the petitioner caused Johnson's injury, the injury could have resulted from a bullet impact regardless of whether there was any damage to the vest, and the injury sustained by Johnson was the result of a bullet that did not strike his vest. Moreover, the existence of damage to Johnson's bulletproof vest would not have tended to undermine his trial testimony. Johnson testified that the petitioner approached the police automobile and, from an arm's distance, pointed his gun at him. He testified that the laser sight of the petitioner's gun was aimed at his head. According to Johnson, he got out of the automobile, striking the petitioner with the door. The petitioner fired two gunshots. Johnson said that he felt pain in the area of his ribs after either the first or second gunshot. Johnson testified that he experienced a "burning sensation from the inside" of his body near his ribs. Johnson did not testify that his vest had been impacted or that it had sustained damage of any type during the shooting.

In light of the foregoing, we conclude that the petitioner has not demonstrated that the habeas court abused its discretion in denying certification to appeal with respect to the issue of whether his due process rights were violated by the prosecutor's purported failure to correct Pleasant's testimony concerning the bulletproof vest worn by Johnson at the time of the shooting.

### III

Next, we consider the petitioner's claim that his trial counsel's performance was deficient and deprived him

of his right to the effective assistance of trial counsel. We are not persuaded.

In his petition for a writ of habeas corpus, the petitioner alleged that his trial counsel were deficient in many respects. In this claim, the petitioner challenges the habeas court's ruling by focusing on three aspects of his ineffective assistance of counsel claim. We will address these subparts of the petitioners claim in turn. Before doing so, however, we set forth relevant legal principles.

"Our standard of review of a habeas court's judgment on ineffective assistance of counsel claims is well settled. In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . .

"The sixth amendment to the United States constitution guarantees a criminal defendant the assistance of counsel for his defense. . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Strickland* requires that a petitioner satisfy both a performance and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . Although a petitioner can succeed only if he satisfies both prongs, a reviewing court can find against the petitioner on either ground. . . .

"We . . . are mindful that [a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. . . . Similarly, the United States Supreme Court has emphasized that a reviewing court is required not simply to give [coun-

sel] the benefit of the doubt . . . but to affirmatively
entertain the range of possible reasons . . . counsel
may have had for proceeding as [he or she] did. . . .

"In assessing prejudice under *Strickland,* the ques-
tion is not whether a court can be certain counsel's
performance had no effect on the outcome or whether
it is possible a reasonable doubt might have been estab-
lished if counsel acted differently. . . . Instead, *Strick-
land* asks whether it is reasonably likely the result
would have been different. . . . The likelihood of a
different result must be substantial, not just conceiv-
able. . . . In a habeas proceeding, the petitioner's bur-
den of proving that a fundamental unfairness had been
done is not met by speculation . . . but by demonstra-
ble realities." (Citation omitted; internal quotation
marks omitted.) *Harris* v. *Commissioner of Correc-
tion,* 205 Conn. App. 837, 856–58, 257 A.3d 343, cert.
denied, 339 Conn. 905, 260 A.3d 484 (2021).

A

First, the petitioner argues that the habeas court
improperly rejected his claim that trial counsel failed
to take adequate steps to inspect the bulletproof vest
worn by Johnson at the time of the shooting and failed
to investigate the condition of the vest in an attempt
to demonstrate that it contradicted the officers' version
of events.

In its decision, the court stated: "[T]he petitioner
asserts that counsel was ineffective for failing to have
[Johnson's] bulletproof vest examined by an expert wit-
ness and to have presented that evidence to the jury.
This claim . . . fails. While [Pleasant] testified that he
witnessed damage to [Johnson's] vest on the night of
the incident, when the attorneys examined it in the
course of a pretrial hearing several weeks before the
trial, there did not appear to be any dispute between
counsel that there was no visible damage. The petition-
er's expert also testified [at the habeas trial] that it
would be normal to find some indication of damage on
a bulletproof vest that had been struck by a bullet, but
he could not find any such indication on [Johnson's]
vest. Notwithstanding, [Gross], the trauma physician
who treated [Johnson], testified that it was his opinion
that the large circular bruising and internal injuries
suffered by [Johnson] were caused by a bullet strike into
the bulletproof vest. [Gross], who also had significant
experience as a military trauma surgeon in active com-
bat zones, testified that the shape and significance of
[Johnson's] injuries could not have been explained by
banging into the door on his way out of the [police]
vehicle. The injury, in his opinion, was caused by a high
velocity object striking his vest.

"In the end, the court finds that the petitioner has
failed to prove prejudice. While the petitioner could
well have presented his expert to testify that there was

no visible external sign of a bullet strike on [Johnson's] vest, the court found [Gross] credible that a high velocity projectile was the only way to explain the injuries he suffered.[7] Therefore, the petitioner has failed to show that there is a reasonable probability that the inclusion of this evidence would have resulted in a more favorable outcome for the petitioner."[8] (Footnotes omitted.)

At the habeas trial, Kestenband and Paetzold testified that there were strategic reasons for not challenging the evidence that a bullet had caused Johnson's injury. Essentially, defense counsel believed that pursuing such a strategy tended to detract from the petitioner's self-defense claim. Also, defense counsel reasoned that, even if the petitioner could have cast doubt on whether a bullet caused the injuries, it would not have afforded him any practical benefit with respect to either the attempted murder charge concerning Johnson, which did not require proof of injury, or the assault charge concerning Johnson. With respect to the latter charge, the state could have requested a lesser included offense instruction for attempt to assault, which did not require proof of injury. Moreover, there also was a belief that the presence of visible damage to the vest was not significant. Defense counsel Paetzold, a former criminologist employed by the state, testified at the habeas trial that he believed that it was possible that a bullet may have impacted the vest without causing visible damage to the vest.

With respect to this claim, the court did not focus on the performance prong of *Strickland* but focused on whether the petitioner had satisfied his burden of demonstrating prejudice. In our plenary review, we agree with the court's analysis. The court properly focused on the importance of Gross' testimony, which was not effectively refuted at the habeas trial, that regardless of whether the vest reflected visible damage, a gunshot was the only way to explain Johnson's injuries. Moreover, in light of the undisputed evidence concerning the petitioner's use of a firearm at the time of the shooting, the issue of whether Johnson actually was struck by a bullet was unrelated to the overriding theory advanced by the defense, namely, that the petitioner had acted in self-defense. It also was not relevant to the issues of whether he had assaulted Otero or attempted to assault Pleasant, as charged. In light of the evidence of the timing and nature of the injuries sustained by Johnson, the petitioner failed to demonstrate how the condition of the vest was likely to undermine a finding that he caused the injuries during the shooting. And, as the court aptly explained, even if the jury had found that the petitioner was not the cause of Johnson's injuries, the state would have been entitled to an instruction on the lesser offense of attempt to commit assault concerning Johnson, which offense would have exposed the petitioner to the same penalty as a conviction of assault, which is a class B felony.

See General Statutes § 53a-59b (b) (defining class of offense); General Statutes § 53a-51 (attempt is crime of same grade and degree as most serious offense that is attempted, except that attempt to commit class A felony is class B felony).

## B

Next, the petitioner claims that the court improperly rejected his claim that trial counsel rendered deficient representation by failing to investigate and present certain evidence in support of his claim of self-defense. Specifically, the petitioner claims that trial counsel should have presented the testimony of a forensic psychologist to explain relevant issues concerning his mental health. In support of this aspect of the claim, he relies on the opinions expressed by Wendy Levy, a clinical psychologist who testified at the habeas trial on his behalf. Levy testified that she reviewed materials related to the events at issue and evaluated the petitioner over the course of two days in December, 2018, and February, 2019. Levy opined that events in the petitioner's childhood caused the petitioner to suffer from a developmental trauma disorder that left him in a state of exhibiting "hyperarousal" and "hypervigilance." Levy also testified that this disorder would have made the petitioner more likely than a person without this disorder to believe that circumstances he encountered were dangerous. The petitioner argues that "a mental health professional would have been critical in this case to educate the jury about [his] specific history of trauma and how that actually had an objective impact on [his] perception and response to the events on that night." Evidence of this nature was not presented during the petitioner's criminal trial.

The petitioner also argues that counsel should have presented the testimony of Josiah Pinault, who testified at the habeas trial but was not contacted by defense counsel at the time of the criminal trial. Pinault testified at the habeas trial that, at or about 10 a.m. on the day of the shooting, he overheard an individual named Angel Rosa deliver a lethal threat to the petitioner. Pinault testified that, at the time of the petitioner's criminal trial in 2004, he was living in Connecticut and would have testified with respect to the threat. The petitioner argues that Pinault would have corroborated his version of events and that doing so was "critical to convincing the jury that [he] was in fear for his life at the time of the incident with the officers. The reality of the prior threat was crucial to display to the jury that the petitioner had reasons to be particularly fearful in the situation. The need to investigate and present other witnesses [like Pinault] was especially crucial considering Rosa's invocation of his fifth amendment privilege [at the time of the criminal trial]."

With respect to this claim, the habeas court stated: "[The petitioner] makes numerous claims that defense

counsel failed to properly investigate and present witnesses to support [his] claim that he was in legitimate fear for his life on the night of the incident because . . . [Rosa] had threatened his life earlier that day and that he believed the plainclothes police had come to carry out that threat. This claim fails because the petitioner has failed to establish prejudice. . . . The petitioner offered the testimony of [Pinault] at the habeas trial. He was only able to offer that he heard the verbal disagreement and the threat being made to the petitioner on the morning of the incident. The petitioner also presented [Levy], a clinical psychologist. She offered that the petitioner has suffered a history of trauma and was likely in a hypervigilant state on the night of the incident. The sum of this testimony, however, was merely cumulative to the . . . [testimony of the petitioner], who was allowed to testify to the threat that had been made on his life and to his general state of mind on the night of the incident. The addition of the testimony provided by Pinault and [Levy] was hardly significant or compelling enough to support the slightest probability of a more favorable outcome. The claim fails because there was no prejudice." (Citation omitted.)

We agree with the habeas court that the petitioner is unable to demonstrate that he was prejudiced by trial counsel's failure to present Pinault's testimony and the type of psychological opinion testimony reflected in Levy's testimony. The petitioner argues that this testimony, in addition to his testimony at the criminal trial, would have helped to corroborate his theory of self-defense and would have made his subjective fear for his life at the time of the shooting more reasonable. We disagree with the court that the failure to present this evidence was not prejudicial because the evidence was, to some extent, cumulative of the petitioner's trial testimony. We are, however, persuaded that the court reached the correct result because the evidence at issue was unlikely to have affected the outcome of the criminal trial.

We note that, although Pinault would have corroborated the petitioner's trial testimony that he had been threatened earlier on the day of the shooting, his testimony could not have shed light on whether the petitioner subjectively believed that the threat was credible or whether he actually feared for his life at the time of the shooting. Also, we disagree with the petitioner's belief that the type of expert opinion presented in the form of Levy's testimony shed light on his mental state at the time of the shooting. The value of Levy's opinions is undermined by the fact that they were based on her evaluation of the petitioner in late 2018 and early 2019. The shooting took place in 2003. Levy did not testify that her diagnosis would have been the same at the time of trial in 2004. In fact, she testified that her diagnosis of "developmental trauma disorder" was not a disorder

listed in the Diagnostic and Statistical Manual of Mental Disorders, which she described as the "bible" of her profession. Levy testified, however, that the petitioner "probably" suffered from post-traumatic stress disorder in 2003 but that she could not be "certain" about that diagnosis.

Ultimately, however, the petitioner's attempt to demonstrate prejudice is hampered by the fact that, even if he had been able to demonstrate that he subjectively feared for his life at the time of the shooting, the evidence presented at trial did not support a conclusion that his use of deadly physical force was objectively reasonable. "[General Statutes §] 53a-19 sets forth the narrow circumstances in which a person is justified in using deadly physical force on another person in self-defense. Under § 53a-19 (a), a person may justifiably use deadly physical force in self-defense only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and (2) that deadly physical force is necessary to repel such attack. . . . [T]he test a jury must apply . . . is a subjective-objective one. The jury must view the situation from the perspective of the defendant . . . [but] . . . the defendant's belief ultimately must be found to be reasonable. . . .

"Thus, with regard to the first requirement of self-defense, the jury must make two separate affirmative determinations for the defendant's claim of self-defense to succeed. The jury must determine whether, on the basis of all of the evidence presented, the defendant in fact believed that the victim was about to use deadly physical force. . . . This initial determination typically requires the jury to assess the veracity of witnesses, often including the defendant, and to determine whether the defendant's account of his belief is in fact credible. . . . If the jury determines that the defendant did not believe that the victim was about to use deadly physical force when the defendant employed deadly force, the defendant's self-defense claim must fail. . . . Even if the jury finds that the defendant may have held such a belief, if that belief was not objectively reasonable, the self-defense claim must fail." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Hughes*, 341 Conn. 387, 398–99, 267 A.3d 81 (2021). We already have discussed the facts the jury reasonably could have found concerning the petitioner's use of deadly physical force against the undercover police officers. We are persuaded that the evidence at issue in this claim was unlikely to have swayed the jury to find that his use of force was objectively reasonable. Thus, we conclude that there is no reasonable probability that if this evidence had been presented at trial, it would have led to a different outcome.

## C

Next, the petitioner claims that the court improperly rejected his claim that the representation he received from trial counsel was ineffective because they failed to "make an adequate and appropriate objection, pursuant to *State* v. *Morales*, [232 Conn. 707, 657 A.2d 585 (1995)], to the state's failure to preserve and make available the vehicle that the officers occupied at the time of the shooting . . . ." We are not persuaded.

With respect to this claim, the court stated: "The vehicle the officers occupied appears to have been stored in a police storage yard following the incident but was ultimately released to a local junkyard about a year after the incident, where it was left uncovered and exposed to the elements. [Paetzold] and Kestenband did go to view the vehicle at the junkyard, once hired, and found it to be in a general state of disrepair. The petitioner . . . has failed to prove his claim.

"Where a defendant claims a violation of his right to a fair trial due to missing or destroyed evidence, 'the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence.' *State* v. *Johnson*, 288 Conn. 236, 275–77, 951 A.2d 1257 (2008), quoting *State* v. *Morales*, supra, 232 Conn. 726–27. In the present case, the petitioner has failed to establish that anything truly 'material' to his defense was actually destroyed or lost by the failure of the police to store the vehicle in a different fashion. He offered the possibility that various tests or examinations could have been run on the vehicle but failed to support those claims with any substantive evidence that those tests or examinations would have resulted in anything significant to the defense. The petitioner's own expert testified that he would be speculating when asked about possible examinations that could have been conducted on the vehicle. For those reasons, the claim fails."

In order to understand the type of objection that is at the heart of this claim, we note that, in *Morales*, our Supreme Court considered what degree of protection the due process clause of our state constitution guarantees to criminal defendants when the police fail to preserve potentially useful evidence. Ultimately, the court reasoned that "the good or bad faith of the police in failing to preserve potentially useful evidence cannot be dispositive of whether a criminal defendant has been deprived of due process of law. . . . [W]e . . . reject [the notion of using a] litmus test of bad faith on the part of the police . . . . Rather, in determining whether a defendant has been afforded due process of law under

the state constitution, the trial court must . . . [weigh] the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence.'' (Footnote omitted; internal quotation marks omitted.) *State* v. *Morales*, supra, 232 Conn. 726–27. In *Morales*, our Supreme Court did not mandate a universal remedy that should be afforded a defendant to offset any prejudice suffered as a result of unavailable evidence, instead noting that "a trial court must decide each case depending on its own facts, assess the materiality of the unpreserved evidence and the degree of prejudice to the accused, and formulate a remedy that vindicates his or her rights." Id., 729.

In order to sustain his burden of proof with respect to his claim that trial counsel rendered ineffective assistance by failing to raise a claim pursuant to *Morales* at trial, the petitioner had to demonstrate not only that counsel performed deficiently but that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. See *Harris* v. *Commissioner of Correction*, supra, 205 Conn. App. 858. Mindful of this burden, we briefly review the evidence presented at the habeas trial that is relevant to the present claim. This evidentiary record includes evidence from the petitioner's criminal trial, including several photographs depicting the undercover police automobile, bullet holes in the automobile, and trajectory rods placed in the bullet holes for the purpose of shooting incident reconstruction. At the criminal trial, Timothy Shaw, a police detective, testified that the police were able to "reconstruct the target lines or trajectory lines on six out of the nine [bullet] holes in the vehicle." During cross-examination, defense counsel elicited through Shaw that one "trajectory line" from the bullet holes in the automobile pointed in the direction of a cluster of spent shell casings that were consistent with the type of firearm used by the petitioner during the shooting. Through questioning of Shaw, defense counsel elicited testimony that the physical position of these particular shell casings at the shooting scene was consistent with the petitioner's version of how the shooting occurred, specifically, in terms of his distance from the undercover police automobile when he discharged his handgun.

Moreover, defense counsel devoted a significant portion of closing argument to inviting the jury to review the shooting scene evidence and to find that it was consistent with the petitioner's version of how the shooting occurred. For example, defense counsel

argued that the location of the shell casings from the petitioner's handgun undermined the testimony of the police officers that the petitioner was in close proximity to the undercover police vehicle. Relying on photographic evidence of the shooting scene that depicted the location of the undercover police vehicle and the location of the shell casings from the petitioner's gun, defense counsel argued that it was not possible that the petitioner could have been near the vehicle and fired the gunshots where the casings were located. Defense counsel stated, "[t]here is no way he was near that car." Defense counsel argued that the shell casings, identified in the photographs of the shooting scene, "show where everybody was." Defense counsel also argued that the photographs reflect that the petitioner "was never near that car . . . ." Relying on the location of the shell casings, defense counsel argued, "[t]he physical evidence and your common sense tells you he was not near that car the way [Johnson] puts him there and the officers put him there. It just didn't happen that way."

Defense counsel also devoted a portion of his argument to discussing the evidence related to the bullet trajectory analysis that had been performed by the state using the undercover police vehicle. Referring to photographs of the shooting scene, defense counsel argued, "[h]ow about the trajectory of the bullets? . . . If you take a look at that when you're deliberating, you'll see that the angle of those bullets does not support the notion [that the petitioner] was shooting from anywhere near the front of the car. The angle was from the rear of the car. It didn't happen the way the state wants you to believe it happened, and that's their theory. . . .

"The state's theory here, that he walks up to that car, identifies them as police officers, and starts firing because of that [and] the physical evidence tells you that it just did not happen that way."

At the habeas trial, Kestenband testified that, prior to the criminal trial, he and Paetzold examined the automobile in the junkyard where it was being stored by the police, but that neither he nor Paetzold consulted an expert to inspect the automobile or raised a claim pursuant to *Morales* during trial. Kestenband recalled that there was a lack of funds to hire an investigator.

Kestenband testified that, at the criminal trial, there was a conflict between the version of events surrounding the shooting as described by the police officers and the petitioner. He aptly described this difference: "[T]he officers said that [the petitioner] approached the car in an effort to sell them drugs. That he either got really close to the car, maybe even had, like, stuck his head in. And, according to the officers, they testified that he identified them as police officers. And the way they reached that conclusion, as I recall, was that they said he said that you all look like a bunch of jakes. And jakes was slang for police officers. And

[the petitioner's] version was that he was further back from the car. That they had driven into a parking lot where, I believe, he was the sole occupant. That . . . it was raining, and he might have been under a tree at one point. He was saying to avoid the rain. That they either drove up to him or summoned him over to the car. . . . And that, at one point, he believed he was about to be robbed and that he used the word jukes, not jakes, and that jukes was slang for a robbery. And that, by virtue of the fact that he thought he was about to be robbed, he started firing." Kestenband testified that determining where the petitioner discharged his firearm, in terms of his distance from the automobile, was relevant in an assessment of which version of events was accurate. He testified, however, that he did not believe that determining the trajectory of the gunshots was "that important" because it "focused more on the angle of the shots . . . [and] that the distance at which the shots were fired was more important . . . ." Kestenband testified that he presumed that, "if the car had been preserved and gunshot residue could have been obtained, that either would have supported or undermined the idea that [the petitioner] was close to the car." Kestenband testified that if he had believed evidence should have been preserved that was not preserved, he would have raised a claim at trial pursuant to *Morales*.

Similarly, Paetzold acknowledged that, at the criminal trial, there was a dispute between the version of events related by the officers and the version of events related by the petitioner. Paetzold testified that, although it could have been helpful to try to undermine the version of events related by the police officers so as to undermine their credibility, his goal was to focus on the "big picture" in this case, meaning the defense of self-defense. Paetzold testified that he vaguely recalled observing the automobile prior to the trial. He said that, "in a shooting case, physical evidence is always important and should be accessible to both sides to investigate and see if there's anything of evidentiary value, including . . . looking at the holes [in the automobile] and seeing the trajectory of . . . if it's possible to determine the angle of how the bullets entered into the holes." Paetzold testified that "it would have been helpful to look at the car for determination of whether there's gunshot residue . . . if you can get it off the car. . . . [I]f the car was . . . outside, gunshot residue may not be available anymore because of weather conditions, et cetera."

Paetzold testified that, although it was "possible" that he could have brought a claim under *Morales* in this case, he did not recall why he did not do so. Paetzold testified that he "probably" relied on his own forensic science background in an evaluation of whether the state had created a situation in which helpful evidence was unavailable to the defense.

Turvey, a forensic scientist and forensic criminologist hired by the petitioner to testify at the habeas trial, stated that, to his knowledge, the automobile was not available for him to inspect prior to the habeas trial because it had been "abandoned to a junkyard, and the location of this vehicle is now unknown." Turvey testified that the automobile was a key piece of evidence for purposes of reconstructing the shooting and that he had examined photographs of the automobile that reflected an attempt to reconstruct the shooting by means of bullet trajectory analysis. Turvey testified, in general terms, that trajectory analysis is a component of shooting incident reconstruction and that it could yield information concerning a shooter's distance from a target. He testified that "shooting incident reconstruction" involves such things as trajectory analysis, ballistics analysis, and gunshot residue analysis. He testified that "[t]here's an actual whole series of things that can be done inside of shooting incident reconstruction to determine the position and angle of the shooter, what weapon they were using, their intended target, their skill level. All these things can be inferred . . . once you have done that shooting incident reconstruction." Turvey testified, however, that, although there was photographic evidence of trajectory analysis having been performed using the automobile, he was unaware of any report having been generated from that analysis in the present case.

Turvey testified that he could "[n]ot reliably" draw any conclusions about the shooting without being able to examine the automobile itself to make necessary measurements. Turvey also testified that outdoor storage of an automobile was "a very bad idea" in terms of preserving it for forensic analysis because such storage not only causes chain of custody problems but permits erosion by means of the elements, thus leading to the physical destruction of the evidence itself. Turvey testified that "the outside elements are really bad, depending on the region. Like, it can be . . . in some regions it could be in extreme heat. It can be extreme cold. It can be extreme weather conditions like rain and wind. These things can destroy items of evidence very quickly in terms of erosion, rust, the changes of the items given the heat, given the cold, and washing away of evidence, given the rain."

The first factor under the *Morales* test is materiality of the missing or destroyed evidence. As this court has explained, "if the state has not tested an item of evidence before its loss or destruction, and no other facts indicate that test results might have proved unfavorable to the defendant, little more is required than a showing that the test could have been performed and results obtained which, in the context of the defendant's version of the facts, would prove exculpatory. . . . Our courts have . . . clarified that [missing] evidence is

material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (Citation omitted; internal quotation marks omitted.) *State* v. *Gray*, 212 Conn. App. 193, 207, 274 A.3d 870, cert. denied, 343 Conn. 929,     A.3d     (2022). This court also has stated that "[t]he defendant's mere speculation that the [lost evidence] could have been beneficial *or not* does not meet the standard necessary to prove materiality." (Emphasis in original; internal quotation marks omitted.) *State* v. *Fox*, 192 Conn. App. 221, 237–38, 217 A.3d 41, cert. denied, 333 Conn. 946, 219 A.3d 375 (2019).

Our careful review of the evidence presented at the habeas trial amply supports the court's determination that the petitioner failed to demonstrate that anything material to the defense was lost by virtue of the manner in which the police stored the automobile. It is undisputed, and the court found, that trial counsel observed the automobile in a junkyard prior to the criminal trial. Counsel did not pursue testing at that time and did not make any further request with respect to the evidence. Although the petitioner, by means of Turvey's testimony, raised the possibility that, had the police stored the automobile in a different manner, certain forensic testing of it, in addition to that which the state already had been performed, could have taken place prior to the petitioner's criminal trial. Turvey, however, lacking any reliable data from which to draw conclusions, essentially speculated about what such testing might have entailed, let alone what it might have revealed. "The petitioner cannot rely on mere conjecture or speculation to satisfy either the performance or prejudice prong but must instead offer demonstrable evidence in support of his claim." (Internal quotation marks omitted.) *Cox* v. *Commissioner of Correction*, 127 Conn. App. 309, 314, 14 A.3d 421, cert. denied, 301 Conn. 902, 17 A.3d 1043 (2011). Moreover, the petitioner argues that the materiality of the forensic testing that was not performed would have been relevant to disproving the version of the shooting that was described by the police. Proving that the petitioner was farther away from the undercover vehicle when he discharged his firearm, he argues, would have undermined the state's case and supported his claim of self-defense.[9]

As we stated previously in our discussion of the present claim, at the criminal trial, defense counsel utilized the results of forensic analysis of the shooting scene, including the results of trajectory analysis that had been performed with the use of the automobile. Rather than suggesting that the defense was left without the benefit of trajectory analysis, defense counsel's cross-examination and arguments at the time of trial reflect defense counsel's belief that the forensic analysis of the crime scene and the automobile that had been performed by the state provided the defense with ample fodder to

undermine the state's theory of the shooting. Simply put, the petitioner in the present claim has not demonstrated what benefit further testing could have provided the defense above and beyond what was already presented to the jury, let alone that such further testing could have been conducted. Thus, the petitioner has failed to demonstrate the materiality of the allegedly destroyed evidence in the sense that the result of the proceeding would have been different if it had been available to the defense at the time of the criminal trial.

Accordingly, we agree with the habeas court that the petitioner has failed to demonstrate that his defense was prejudiced as a result of counsel's failure to raise a claim under *Morales* on the ground that the automobile was unavailable for testing due to the manner in which it had been stored. The petitioner has failed to prove that, had defense counsel at trial raised a claim under *Morales* with respect to the automobile, such claim would have been successful.

For the foregoing reasons, we conclude that the petitioner has not demonstrated that the habeas court abused its discretion in denying certification to appeal with respect to the issue of whether he had been deprived of his right to a fair trial because of ineffective representation afforded him by trial counsel.

IV

Next, the petitioner claims that his appellate counsel's performance was deficient and deprived him of his right to the effective assistance of appellate counsel. We are not persuaded.

In this claim, the petitioner challenges the court's rejection of three aspects of his claim of ineffective assistance of prior appellate counsel. First, he argues that appellate counsel should have "raised a more reasonable challenge to the trial court's actions related to [Rosa]." Second, he argues that appellate counsel should have raised a claim under *State* v. *Morales*, supra, 232 Conn. 707, "related to the trial court's refusal to take action related to the lack of preservation of the officers' vehicle." Third, he argues that, although appellate counsel raised a claim of prosecutorial impropriety in the petitioner's direct appeal, the claim did not encompass the fact that, during closing argument, the prosecutor vouched for Johnson's credibility. Thus, the petitioner argues that "[a]ppellate counsel failed to raise a critical component of the prosecutorial impropriety claim on appeal."

We note that, in its memorandum of decision, the habeas court rejected all of the petitioner's ineffective assistance of appellate counsel claims by means of the following analysis: "The petitioner . . . claims that [Evans] was ineffective in representing him in his direct appeal. The court decided this matter based on the fact that it finds no deficiency in appellate counsel's

performance. [Evans] testified credibly that she read through the petitioner's case, prepared those issues she believed had a best chance on appeal, and winnowed out weaker arguments. That is appellate counsel's job. . . . The petitioner failed to present any credible evidence that appellate counsel's decision on the issues she raised was objectively unreasonable or that she failed to raise some other issue that had an objectively reasonable possibility of succeeding on appeal. For those reasons, [the claim of ineffective representation by appellate counsel] fails." (Citation omitted.)

Before addressing the arguments raised by the petitioner, we set forth the applicable standard of review. "The two-pronged test of *Strickland* v. *Washington*, [supra, 466 U.S. 687], applies to claims of ineffective assistance of appellate counsel. . . . *Strickland* requires that a petitioner satisfy both a performance and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . .

"[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. . . . In a habeas proceeding, the petitioner's burden of proving that a fundamental unfairness had been done is not met by speculation . . . but by demonstrable realities. . . .

"To establish that the petitioner was prejudiced by appellate counsel's ineffective assistance, the petitioner must show that, but for the ineffective assistance, there is a reasonable probability that, if the issue were brought before us on direct appeal, the petitioner would have prevailed." (Citations omitted; internal quotation marks omitted.) *Lewis* v. *Commissioner of Correction*, 211 Conn. App. 77, 98–99, 271 A.3d 1058, cert. denied, 343 Conn. 924, 275 A.3d 1213 (2022).

A

The first claim of ineffective assistance of appellate counsel pertains to the claim raised in the petitioner's direct appeal with respect to Rosa's invocation of his fifth amendment privilege during the petitioner's criminal trial. We previously have discussed the petitioner's trial testimony concerning Rosa in part III B of this opinion. The record from the petitioner's criminal trial

reflects that, outside of the presence of the jury, Rosa invoked his fifth amendment privilege and that the state declined the request of the petitioner's trial counsel to grant Rosa immunity.

In his petition for a writ of habeas corpus, the petitioner alleged in relevant part that appellate counsel rendered ineffective assistance because she "failed to raise a challenge to the trial court's refusal to allow the petitioner to call [Rosa] as a defense witness and have any invocation of Rosa's fifth amendment privilege occur before the jury," and "failed to raise a challenge to the trial court's refusal to allow the petitioner to call [Rosa] as a defense witness and have any invocation of Rosa's fifth amendment privilege occur on a question-to-question basis . . . ." In his posttrial brief before the habeas court, the petitioner, relying on the evidence presented at the habeas trial, also argued that appellate counsel was ineffective for failing to claim that the court erred by not addressing Rosa's invocation of his right not to testify. Specifically, the petitioner argued that appellate counsel should have claimed that the trial court erred "by not giving an appropriate instruction related to Rosa in the event he was not called to testify." The petitioner presently argues that an appropriate instruction would have been "to inform the jury that Rosa did exist and that the jury should not take any adverse inference from either party's failure to call him."

The petitioner argues that, although appellate counsel raised a claim in the direct appeal related to Rosa's invocation of his right against self-incrimination, counsel followed a deficient tactical path because she "pursued a low probability Hail Mary [claim] where several more viable paths to victory were available."[10] The petitioner argues that counsel should have raised the additional arguments concerning Rosa set forth herein. He characterizes these additional claims as "complementary alternative claims."

It suffices to observe that, in the petitioner's appellate brief, he merely asserts that the aforementioned errors were committed by the trial court. He has failed to present this court with any authority in support of his assertions that the court acted improperly with respect to Rosa's invocation of his fifth amendment privilege or that it was obligated to instruct the jury concerning Rosa's unavailability. Although the petitioner disputes the explanation provided by appellate counsel for not challenging on appeal the lack of a jury instruction concerning Rosa, he does not cite to any authority for the proposition that the trial court was compelled to deliver the instruction in the first place. Setting aside these fundamental deficiencies, the petitioner merely asserts in conclusory fashion that "[t]here is a reasonable probability that a properly presented claim related to the testimony of Rosa would have been successful

on appeal."

We agree with the court that the petitioner has failed to demonstrate that his appellate counsel's performance was deficient for having failed to raise these claims. We also agree with the respondent that the petitioner's claim amounts to little more than speculation that, even if appellate counsel's performance was deficient and she had raised the claims at issue, the result of the direct appeal would have been different. As we have explained previously, it was not sufficient for the petitioner to demonstrate that one or more trial errors occurred that were left unchallenged on appeal by appellate counsel. To prevail with respect to any aspect of the present claim at the habeas trial, the petitioner bore the burden of demonstrating not merely that a reviewing court would have found error but that raising the claims would have resulted in a reasonable probability that he would have prevailed on direct appeal. See, e.g., *Lewis* v. *Commissioner of Correction*, supra, 211 Conn. App. 99. He has failed to do so.

B

The petitioner asserts that appellate counsel rendered ineffective assistance by failing to raise a claim under *Morales* "related to the trial court's refusal to take action related to the lack of preservation of the officers' vehicle." In part III C of this opinion, we rejected the petitioner's claim that trial counsel rendered ineffective assistance by virtue of their failure to raise a claim under *Morales*; facts underlying the *Morales* claim are adequately set forth therein. The petitioner correctly acknowledges that, when the issue of the police automobile was raised at his criminal trial, defense counsel did not seek any type of remedy. At the criminal trial, Paetzold represented to the court that he had seen the automobile, that it was located in a Wethersfield junkyard, and that "[i]t's a question . . . whether the defense has an opportunity to view the [automobile] in the same condition as it was in at the time that the incident took place." Nonetheless, Paetzold stated, "[w]e are not making an issue at this point about that." In fact, to the extent that defense counsel had made representations or arguments concerning the automobile, Paetzold emphasized that "it would be appropriate to have the car stored in a better situation than where it is now. But as far as an issue about the car, I agree with [the prosecutor], at this point there is no issue about the car [being raised before the court]." The court responded, "Excellent. Now we have an agreement by all three of us."

Presently, the petitioner argues that, despite the foregoing representations by defense counsel and, in particular, the fact that the court was not asked to provide the petitioner with any type of remedy vis-à-vis the automobile, "[t]he record was . . . adequate for appellate counsel to raise a claim under [the bypass doctrine

in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015)] that the petitioner's right to have the state . . . preserve potentially helpful evidence was violated by the state's failure to preserve the evidence." The petitioner also observes that, when appellate counsel was asked about this potential claim during the habeas trial, she "offered no explanation for her failure to raise this claim on appeal."

In *Golding*, our Supreme Court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

With respect to the reviewability prong of *Golding*, our Supreme Court stated that "[t]he defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." Id., 240. Subsequently, this court stated that "[i]t is axiomatic that this court will not resort to speculation and conjecture in avoidance of an inadequate record." *State* v. *Durdek*, 184 Conn. App. 492, 505, 195 A.3d 388, cert. denied, 330 Conn. 934, 194 A.3d 1197 (2018).

The petitioner bears the burden of demonstrating that, had appellate counsel raised the claim at issue under *Morales*, there was a reasonable probability that he would have prevailed in his direct appeal. See, e.g., *Lewis* v. *Commissioner of Correction*, supra, 211 Conn. App. 99. Thus, the petitioner bears the burden of demonstrating that, even if appellate counsel's performance was deficient for having failed to raise the present unpreserved claim under *Golding*, as he argues, such deficient representation was prejudicial because there was a reasonable probability that a reviewing court would have found a *Golding* violation that entitled him to relief.

The petitioner has not provided this court with an analysis of the claim under all four prongs of *Golding*.

With respect to *Golding*'s first prong, he merely argues, without citation to authority or the record, that the record was adequate to raise a *Golding* claim. Even a cursory review of the trial court record flatly contradicts this assertion. The record is devoid of an adequate factual record with respect to whether a *Morales* violation had occurred. That is, despite the assumptions made by the petitioner in his arguments before this court, at the time of trial, there was no record made of whether the manner in which the automobile was being stored had resulted in the loss of material evidence. The petitioner did not attempt to satisfy that burden until the time of the habeas trial. There is more than a reasonable probability that a reviewing court would have disposed of a *Golding* claim, if it had been raised by appellate counsel, under *Golding*'s first prong. Consequently, on this record, we agree with the habeas court that the petitioner has failed to demonstrate that counsel acted deficiently for failing to raise this claim. Moreover, we are persuaded that, even if appellate counsel had acted deficiently, counsel's performance was not prejudicial. As we already have explained, if an unpreserved *Morales* claim had been raised in the direct appeal, a reviewing court most likely would have concluded that it failed under *Golding*'s first prong. For these alternative reasons, we conclude that the habeas court properly rejected this claim.

C

The petitioner next asserts that his appellate counsel rendered ineffective representation by failing to claim in his direct appeal that the prosecutor had improperly vouched for Johnson's credibility during closing argument to the jury. The petitioner argues that this claim of prosecutorial impropriety should have been raised in conjunction with other claims of prosecutorial impropriety that appellate counsel raised in the direct appeal.

The following additional facts are relevant to this claim. During the prosecutor's rebuttal closing argument, the prosecutor drew the jury's attention to a portion of defense counsel's closing argument that attempted to cast doubt on Johnson's trial testimony. The prosecutor stated: "Now, [Johnson's] testimony has been criticized by my learned . . . cocounsel on defense, you know, if you listen back to [Johnson's] testimony, there is a point at which it's very chilling—at least I thought it was chilling in his description—and he describes the laser coming [from the petitioner's gun] up the car onto his body, onto his face, and that's when he reacted and he gets out of the car and he shoots, whether it was the first shot or second shot that hit him.

"Now, counsel makes much of the fact that this testimony didn't match up exactly with his police report and what he told the other officers. Well, I would argue to you that a reasonable inference could be drawn that,

I would say, [Johnson] was a little bit upset by what had transpired. He said on the stand that he believes he fired his weapon at his attacker when he got out of the car. There is no evidence of that. In fact, there is no evidence . . . that he fired his weapon at all until he got down the alley and onto Park Street.

"Now, that tells you something about [Johnson]. He's a trained police officer. Someone just tried to kill him. He's in pain. Adrenalin is going. He never fires his weapon, never fires his weapon at the attacker until he gets onto Park Street after the other officers have already emptied their guns. What does that tell you about what's going through his mind? He's not thinking clearly. He's thinking, I just about got killed. He's got that loaded .45 caliber gun in his hand, and he doesn't discharge it. Was he nervous? I would say that almost being killed makes you kinda nervous. It shows that. Any surprise that his testimony here is not necessarily consistent with what actually happened that night or his report, which is written days after, trying to reconstruct this, this incident."

The petitioner's trial counsel did not object to this argument. The petitioner's appellate counsel did not raise a claim concerning this argument. Presently, the petitioner argues that "[t]his argument constitutes a harmful form of vouching: the prosecutor vouching that the inaccuracy in Johnson's testimony actually affirms the reliability of that testimony. In other words, if a trained police officer could not detail to the jury accurately what had happened, it could only be because the officer had been placed in extreme danger in the line of duty. This was inappropriate argument, and appellate counsel should have challenged it in the petitioner's direct appeal." The petitioner asserts that, at the habeas trial, the petitioner's appellate counsel did not provide a strategic reason for failing to raise this claim on direct appeal but, rather, reflected an erroneous belief that she had, in fact, raised this claim in the direct appeal.

The petitioner has failed to cite any authority to support a conclusion that appellate counsel was deficient in failing to raise this claim or that there was a reasonable probability that, if the claim had been raised, it would have affected the outcome of the direct appeal. Our assessment of the claim requires that we consider, under the appropriate analytical framework that the petitioner seemingly overlooks in the present appeal, the merits of the claim that impropriety deprived the petitioner of a fair trial.[11]

Our courts have recognized guiding principles that govern a prosecutor's leeway in commenting on the truthfulness of a witness' testimony. "We consistently have held that it is improper for a prosecuting attorney to express his or her own opinion, directly or indirectly, as to the credibility of witnesses. . . . Such expressions of personal opinion are a form of unsworn and

unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Put another way, the prosecutor's opinion carries with it the imprimatur of the [state] and may induce the jury to trust the [state's] judgment rather than its own view of the evidence. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions. . . .

"We have held, however, that [i]t is not improper for the prosecutor to comment [on] the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand." (Citations omitted; internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 35–36, 917 A.2d 978 (2007). "In claims of improper vouching, our Supreme Court has noted that the degree to which a challenged statement is supported by the evidence is an important factor in determining the propriety of that statement. The Supreme Court [has] stated that [a] prosecutor may properly comment on the credibility of a witness where . . . the comment reflects reasonable inferences from the evidence adduced at trial." (Internal quotation marks omitted.) *State* v. *Luther*, 114 Conn. App. 799, 812, 971 A.2d 781, cert. denied, 293 Conn. 907, 978 A.2d 1112 (2009).

The petitioner has not established that an impropriety occurred because he has failed to demonstrate that the prosecutor expressed a personal belief in Johnson's credibility. The prosecutor did not *baldly state* that Johnson was an honest, credible, or truthful person. Far from suggesting that the prosecutor's statements were the product of his familiarity with Johnson or facts outside of the record, his assessment of Johnson's trial testimony was obviously based on his explicit and repeated references to the evidence concerning the shooting and the reasonable inferences to be drawn therefrom. Here, the prosecutor, confining his comments to the facts in evidence, invited the jury to infer that any inconsistencies in Johnson's recollection of the shooting were the result of the emotional state he was in following the life-threatening events in which Johnson was involved.

Having concluded that no impropriety occurred, we agree with the habeas court that the petitioner failed to demonstrate that his appellate counsel's representation was deficient for having failed to raise this claim in the direct appeal. We likewise conclude that, even if such claim had been raised, it is not reasonably likely that

it would have changed the outcome of the direct appeal.

For the foregoing reasons, we conclude that the petitioner has not demonstrated that the habeas court abused its discretion in denying certification to appeal with respect to the issue of whether he had been deprived of his right to a fair trial because of ineffective representation afforded him by appellate counsel.

V

Finally, the petitioner claims that the habeas court committed an evidentiary error that entitles him to a new trial.[12] We are not persuaded.

The following additional facts are relevant to this claim. In the habeas petition, the petitioner alleged in count one that his right to due process and a fair trial were violated by the prosecutor's "knowing presentation of false testimony." Specifically, the petitioner alleged that "Pleasant falsely testified that Johnson was shot by the petitioner on June 5, 2003, with a bullet that was lodged in or otherwise damaged Johnson's bulletproof vest and that Pleasant witnessed damage to the vest shortly after the shooting." The petitioner alleged that "[t]he prosecuting authority and judicial authority *were aware that this testimony was false.*" (Emphasis added.)

The record reflects that, during examination of the prosecutor by the petitioner's habeas counsel, the petitioner's counsel asked whether the prosecutor had "a belief about whether the vest could have been struck by a bullet and not be damaged . . . ." The prosecutor replied, "I think it's possible." The petitioner's counsel then asked the prosecutor if he undertook "any investigation in this case to look at that . . . ." The prosecutor replied that he did not recall. The petitioner's counsel then asked, "[a]nd if you had wanted to do that, did you know someone you could call to explore that?" The respondent objected on the ground that the inquiry was irrelevant to the petitioner's claim that the prosecutor *knew* that Pleasant had provided false testimony. The court sustained the objection. The court stated that any inquiry into what additional investigation could have been undertaken by the prosecutor was irrelevant to the petitioner's claim, which was based on "what he knew and what he did." The petitioner's counsel stated that be believed the inquiry was proper because it was relevant to proving that the prosecutor knew "or should have known that it was false."

The petitioner, without citing to any legal authority, argues that the court's ruling was erroneous because "the legal standard is whether the prosecuting authority knew or should have known that the testimony was false. Exploring the availability of reliable forensic information once the issue was raised with the prosecutor was relevant to the question of whether he knew or should have known that the jury was being misled."

"We review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . The trial court has wide discretion to determine the relevancy [and admissibility] of evidence . . . . In order to establish reversible error on an evidentiary impropriety . . . the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." (Citations omitted; internal quotation marks omitted.) *State* v. *Cecil J.*, 291 Conn. 813, 818–19, 970 A.2d 710 (2009).

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1. "As it is used in our code, relevance encompasses two distinct concepts, namely, probative value and materiality. . . . Conceptually, relevance addresses whether the evidence makes the existence of a fact material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . In contrast, materiality turns upon what is at issue in the case, which generally will be determined by the pleadings and the applicable substantive law. . . . If evidence is relevant and material, then it may be admissible." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Zillo*, 124 Conn. App. 690, 696–97, 5 A.3d 996 (2010), cert. denied, 334 Conn. 923, 223 A.3d 380 (2020).

Generally, "[a] habeas corpus action, as a variant of civil actions, is subject to the ordinary rules of civil procedure, unless superseded by the more specific rules pertaining to habeas actions . . . ." (Internal quotation marks omitted.) *Nelson* v. *Commissioner of Correction*, 326 Conn. 772, 782, 167 A.3d 952 (2017). "It is well settled that [t]he petition for a writ of habeas corpus is essentially a pleading and, as such, it should conform generally to a complaint in a civil action. . . . The principle that a plaintiff may rely only upon what he has alleged is basic. . . . It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint. . . . While the habeas court has considerable discretion to frame a remedy that is commensurate with the scope of the established constitutional violations . . . it does not have the discretion to look beyond the pleadings and trial evidence to decide claims not raised." (Internal quotation marks omitted.) *Abdullah* v. *Commissioner of Correction*, 123 Conn. App. 197, 202, 1 A.3d 1102, cert. denied, 298 Conn. 930, 5 A.3d 488 (2010). "[A] habeas petitioner is limited to the allegations in his petition, which are intended to put the [respondent] on notice of the claims made, to

limit the issues to be decided, and to prevent surprise." (Internal quotation marks omitted.) *Moye* v. *Commissioner of Correction*, 316 Conn. 779, 789, 114 A.3d 925 (2015).

The petitioner does not dispute that the claim framed in count one of his amended petition was based on the prosecutor's *knowing* presentation of false evidence; he did not base his claim on the alternative ground that the prosecutor *should have known* that Pleasant's testimony was false. Likewise, the petitioner does not dispute that the inquiry prohibited by the court, into what further investigation the prosecutor could have undertaken concerning the bulletproof vest, was not relevant to what the prosecutor actually knew at the time of trial and what he did during the trial. To the extent that the inquiry might have been probative with respect to what the prosecutor should have known with respect to the vest and, thus, the veracity of Pleasant's testimony, it was not material to an issue framed by the petitioner's amended petition. Accordingly, we conclude that the court, relying on the ground of relevance, properly exercised its discretion by excluding the inquiry.[13]

For the foregoing reasons, we conclude that the petitioner has not demonstrated that the habeas court abused its discretion in denying certification to appeal with respect to the evidentiary issue addressed in this claim.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] The jury found the petitioner not guilty of three counts of attempt to commit murder in violation of General Statutes §§ 53-49 (a) (2) and 53a-54a and three counts of assault of public safety personnel in violation of General Statutes § 53a-167c (a) (2).

[2] The court later granted in part and denied in part the petitioner's motion for articulation of its decision.

[3] Mindful that a petitioner is unable to demonstrate that a court abused its discretion in denying a petition for certification to appeal with respect to a ground that was not raised before the habeas court in support of the petition; see, e.g., *Tutson* v. *Commissioner of Correction*, 144 Conn. App. 203, 216–17, 72 A.3d 1162, cert. denied, 310 Conn. 928, 78 A.3d 145 (2013); we observe that the grounds set forth in the petition for certification to appeal encompass the claims raised in this appeal.

[4] The habeas court stated that Johnson "was ultimately diagnosed with a bruised liver and [a] cracked rib on his right side."

[5] "The rules governing our evaluation of a prosecutor's failure to correct false or misleading testimony are derived from those first set forth by the United States Supreme Court in *Brady* v. *Maryland*, [supra, 373 U.S. 86–87]." *Adams* v. *Commissioner of Correction*, 309 Conn. 359, 369, 71 A.3d 512 (2013).

[6] As the court instructed the jury in this case, "[t]he starting point of the inquiry is whether the [petitioner] believed that the degree of force he used was necessary. Next, you must focus on whether that belief was reasonable. In doing so, you must view the [petitioner's] belief from his standpoint at . . . the time and under all of the existing circumstances. The test is not what the complainants in this case intended—that would be [Johnson, Otero and Pleasant]—but what the [petitioner], in fact, believed and whether that belief was reasonable."

[7] The court noted that the evidence at the petitioner's criminal trial reflected that Johnson had sustained a bruised liver and a cracked rib.

[8] The court also stated: "While the petitioner was convicted of assault [in

the] first degree as to [Johnson], which necessarily required proof that he caused injury with a deadly or dangerous weapon, he was also charged with attempt to commit assault in the first degree, in the alternative. Therefore, even if counsel had been successful in convincing a jury that the petitioner's bullet did not actually strike [Johnson], there is irrefutable evidence that he pointed the gun directly at him and fired at least twice, and [a] conviction for attempted assault in the first degree would have exposed him to the same penalties."

We note that, although the court incorrectly stated that the petitioner had been charged with assault in the first degree with respect to Johnson, its rationale is still sound, as the state was entitled to seek a lesser included offense instruction with respect to the charge of attempt to commit assault in the first degree.

[9] The petitioner argues that he satisfied *Morales'* materiality requirement because Turvey "testified [that] a preserved car would be critical to examine questions of the position and distance of the petitioner at the time of the shooting, a question that drove to the core of the disputed facts at the petitioner's criminal trial."

[10] In the petitioner's direct appeal, this court summarized the petitioner's claim as follows: "The [petitioner] raises multiple claims regarding the assertion by a witness, Angel Rosa, of his fifth amendment privilege against self-incrimination. On appeal, the [petitioner] claims that he was deprived of his constitutional right to compulsory process to produce witnesses on his behalf under the sixth amendment to the United States constitution and that he was forced to waive his constitutional right to remain silent under the fifth amendment. The [petitioner] argues that his constitutional rights were violated by Rosa's assertion of an invalid fifth amendment privilege against self-incrimination and, in the alternative, by the court's refusal to compel the prosecution to grant the witness immunity." (Footnote omitted.) *State* v. *Ayuso*, supra, 105 Conn. App. 309–10. This court rejected the petitioner's claims in this regard. See id., 315, 319.

[11] "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . [T]he defendant has the burden to show both that the prosecutor's conduct was improper and that it caused prejudice to his defense. . . .

"In determining whether the defendant was deprived of his due process right to a fair trial, we are guided by the factors enumerated by [our Supreme Court] in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). These factors include [1] the extent to which the [impropriety] was invited by defense conduct or argument, [2] the severity of the [impropriety], [3] the frequency of the [impropriety], [4] the centrality of the [impropriety] to the critical issues in the case, [5] the strength of the curative measures adopted, and [6] the strength of the state's case. . . . [A] reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the [impropriety] is viewed in light of the entire trial. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Internal quotation marks omitted.) *State* v. *Sinclair*, 332 Conn. 204, 236–37, 210 A.3d 509 (2019).

[12] We note that, in the petitioner's statement of the claim in his brief, he refers to the court's having committed "several evidentiary errors . . . ." The petitioner, however, limits his analysis of this claim to the single evidentiary ruling that we review herein.

[13] The petitioner argues that, if the evidence did not demonstrate that the prosecutor knew or should have known that the testimony about the vest was false or misleading, "a remand is appropriate because the habeas court's limitation on this questioning was an abuse of discretion." Having concluded that the court properly limited the scope of the petitioner's inquiry, we reject this argument.